**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Environmental Law and Policy Center, *et al.*,          Case No. 3:17CV01514

        Plaintiffs,

      v.                                                                    Order

United States Environmental Protection Agency, *et al.*

        Defendants.

The Water Department of the City of Toledo, Ohio, provides water to about 500,000 persons living in that City and elsewhere in Northwest Ohio. For three days in August 2014, those people were without water. (A.R. 2085).[1] Shortly after the City gave notice that its water was not fit to drink (or use for any other household purpose) bottled water in grocery and convenience stores, gas stations, and other outlets was quickly sold out.

Toledo's water was contaminated by microcystin–a toxin produced by Harmful Algae Blooms (HABs) growing near the City's water intake point and elsewhere in the Western Basin of Lake Erie.

Microcystin is dangerous. It "causes diarrhea, vomiting and liver-functioning problems, and readily kills dogs and other small animals that drink contaminated water."[2] And one need not ingest the toxin to experience ill-effects; the Ohio Environmental Agency (Ohio EPA) reports

---

[1] Citations designated "A.R." refer to the administrative record.

[2] Michael Wines, *Behind Toledo's Water Crisis, a Long-Troubled Lake Erie*, The New York Times (Aug. 4, 2014), https://www.nytimes.com/2014/08/05/us/lifting-ban-toledo-says-its-water-is-safe-to-drink-again.html (last visited March 16, 2018).

that mere skin contact with a mirocystin-laden HAB can cause "numbness, and dizziness, nausea . . . skin irritation or rashes." (A.R. 2085).

Over the past decade, HABs have increasingly taken hold in the western third of Lake Erie. Up close, these toxic growths "look like film, crust . . . spilled paint, pea soup," "or green cottage cheese curd" on the water's surface.[3]

The view from afar is equally dramatic. Lake Erie's 2015 HAB, for example, "was the largest on record . . . . le[aving] behind a thick, paint-like scum that covered an area roughly the size of New York City" (A.R. 2329):



---

[3] Ohio Environmental Protection Agency, *Ohio Algae Information for Recreational Waters*, http://epa.ohio.gov/habalgae.aspx#147744472-basics (last visited March 16, 2018).

(Image taken from *Summary of Ohio's new HAB Rules and Drinking Water Response Strategy*, pg. 11 of 36, Ohio Environmental Protection Agency Webinar published June 7, 2016).[4]

The principal cause of Lake Erie's now perennial HAB is phosphorus runoff from fertilizer, farmland manure, and, to a lesser extent, industrial sources, and sewage treatment plant discharges. The Maumee River, boasting the largest drainage area of any Great Lakes river, is the major tributary flowing into the Western Lake Eire Basin. Its watershed encompasses Northwestern Ohio and parts of Northeastern Indiana–with Northwest Ohio's farmland having a principal role in Ohio's agricultural industry, among the most important in the State. Other Lake Erie tributaries–the Huron and Vermillion Rivers among them, also drain agricultural areas of Northwest Ohio.

The major federal legislation intended to safeguard these waters is the Clean Water Act (CWA) 33 U.S.C. § 1251 *et seq.*

The CWA requires the Ohio EPA to submit a biennial Report to the U.S. EPA identifying waters within the State's borders that fail to meet Ohio's water quality standards. 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. §§ 130.7(b)(3), (d). The U.S. EPA can approve the Report "only if" the Ohio EPA "assemble[s] and evaluate[s] all existing and readily available water quality-related data and information" concerning these impaired waters, 40 C.F.R. §§ 130.7(d)(2), (b)(5).

For certain limited areas of Lake Erie, the Ohio EPA has done that. The State Agency has, for example, included "portions" of Lake Erie on its list of impaired waters since 2004. (Doc. 26-1, ID 8983). Further, following the 2014 Toledo water crisis, the Ohio EPA also "began

---

[4] The Ohio EPA's website features images of HABs on various bodies of water dating back to at least 2010.

assessing and listing portions of the Lake Erie shoreline," including some (but not all) of the State's water intake points as impaired for "public drinking water supply." (*Id.*).

But historically, the State has also restricted its testing areas, with "assessment units" extending only "100 meters from the shore," and encompassing a "500-yard radius" around the public water intake points "associated with the nearest shoreline unit[.]" (Doc. 1-7, ID 141).[5] The Ohio EPA has routinely failed to assess Lake Erie's open waters–those "beyond the shoreline and drinking water intake[]" areas and site of the recurring toxic algae bloom. (Doc. 1-7, ID 164).

Ohio's persistent failures came to a head in 2016.

That year, in its Report to the U.S. EPA, the Ohio EPA explicitly refused to "assemble and evaluate all existing and readily available water quality-related data and information" concerning Lake Erie's open waters. 40 C.F.R. § 130.7(b)(5). Its rebuke put the U.S. EPA in a difficult position; the Federal Agency could approve the State's impaired waters list "only if" the Ohio EPA met its CWA obligations. 40 C.F.R. § 130.7(d)(2). Given the State's admitted refusal to meet those obligations, an outside observer might have expected the U.S. EPA to disapprove the State's impaired waters list, and with it, the 2016 Report.

But it did not.

_____

[5] To be precise, the Ohio EPA assesses "three shoreline areas of the [L]ake: western (Ohio/Michigan state line to eastern terminus of Sandusky Bay opening to Lake Erie); central (eastern terminus of Sandusky Bay opening to Lake Erie to Ohio/Pennsylvania state line); and Lake Erie islands (including South Bass Island, Middle Bass Island, North Bass Island, Kelleys Island, West Sister Island and other small islands) extending 100 meters from the shore. These assessment units also include Public Drinking Water Supply intake zones (500-yard radius around the intakes) associated with the nearest shoreline unit even if they are greater than 100 meters from the shore." (Doc. 1-7, ID 141).

Instead, the U.S. EPA approved Ohio's impaired waters list and its 2016 Report, and "deferred to the State's judgment not to assess the open waters of the Western Basin of Lake Erie," (A.R. 3371), the same waters where Toledo's Water Department detected "cyanotoxins . . . recognized to be a hazard to humans, animals and ecosystems" just two years earlier. (A.R. 2728).

Plaintiffs in this case challenge the U.S. EPA's approval of Ohio's 2016 impaired waters list under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 704. They dispute the continuing failure of the Ohio EPA and the U.S. EPA to perform their mandatory duties under the CWA, if not entirely, then at least rigorously and effectively.

Pending are the parties' counter-motions for summary judgment. (Docs. 18, 21, 22).

I begin my adjudication of the motions with an overview of the CWA's requirements and the Agencies' substantial noncompliance, beginning in 2012, with those requirements. Next, I relate developments in this case since shortly before the plaintiffs filed their motion and thereafter.

For the reasons that follow, I: 1) deny plaintiffs' motion for summary judgment, without prejudice; 2) hold my ruling on defendants' motion for summary judgment in abeyance; 3) remand, while retaining jurisdiction over this case, to the U.S. EPA for action consistent with this Order; and 4) timetable dates for status report(s) and a status conference.

### 1. Statutory and Regulatory Background

The CWA "is a comprehensive water quality statute designed to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994) (quoting 33 U.S.C. § 1251(a)). A

cooperative statute, the CWA "establishes distinct roles for the Federal and State Governments" in reducing pollution. *Id.*

On the federal level, "the Administrator of the Environmental Protection Agency . . . is required, among other things, to establish and enforce technology-based limitations on individual discharges into the country's navigable waters from point sources." *Id.* (citing 33 U.S.C. §§ 1311, 1314). Not all pollutants, however, enter the water through "discernable . . . and discrete" point sources, such as discharges from industrial pipes or sewerage treatment plants. *Am. Paper Institute, Inc. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993) (citing 33 U.S.C. § 1362(14) (brackets omitted)); *see also Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp.2d 210, 214 (D. D.C. 2011).

"Sediments and other biological materials can easily accumulate in rivers through normal ecological processes," such as erosion and drainage. *Anacostia Riverkeeper*, 798 F. Supp.2d at 214. "Many toxins," including phosphorous, can also "enter[] water systems through runoff from agricultural land." *Id.* "Unlike point source pollutants, EPA lacks the authority to control [these] non-point source discharges through a permitting process." *Defenders of Wildlife v. EPA*, 415 F.3d 1121, 1124 (10th Cir. 2005). Congress instead assigned that task to the states, who enjoy "the primary responsibilit[y] and right[] . . . to plan the development and use of [their] land and water resources." 33 U.S.C. § 1251(b).

CWA § 303 requires states "to institute comprehensive water quality standards establishing water quality goals for all intrastate waters." *PUD No. 1*, 511 U.S. at 704 (citing 33 U.S.C §§ 1311(b)(1)(C), 1313)). A state's water quality standards "have two primary components:" first, "designated 'uses' for a body of water (*e.g.,* public water supply, recreation,

agriculture)" and second, a set of water quality "'criteria' specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses." *Am. Paper*, 996 F.2d at 349 (citing 33 U.S.C. § 1313(c)(2)(A)).

A lake's "designated use" is exactly what it sounds like–a description of "the manner in which . . . waters are to be utilized by governments, persons, animals, and plants." *Anacostia Riverkeeper*, 798 F. Supp.2d at 215 (footnote omitted). Ohio EPA, for instance, designates Lake Eire for use as an "exceptional warmwater habitat," a "public water supply, agricultural water supply, industrial water supply," and for recreational "bathing." Ohio Admin. Code § 3745-1-31(A).

"Water quality criteria, on the other hand, are measures of the conditions of a water body." *Anacostia Riverkeeper*, 798 F. Supp.2d at 215. They can be expressed either as "specific numerical limitations on the concentration of a specific pollutant in the water (*e.g.*, no more than .05 milligrams of chromium per liter) or more general narrative statements applicable to a wide set of pollutants (*e.g.*, no toxic pollutants in toxic amounts.)." *Am. Paper*, 996 F.2d at 349 (footnote omitted). Most relevant to the instant dispute is Ohio's narrative criteria regarding algae, which declares that "all surface waters . . . shall be . . . [f]ree from nutrients entering the waters as a result of human activity in concentrations that create nuisance growths of aquatic weeds and algae." Ohio Admin. Code § 3745-1-04(E).

Regardless of whether they are numeric or narrative, the "key aspect of water quality criteria is that they are dependent upon designated uses associated with them." *Anacostia Riverkeeper*, 798 F. Supp.2d at 215. States "must," in other words, "adopt those water quality

criteria" sufficient to "protect the designated use" assigned to a water body. 40 C.F.R. § 131.11(a).

Once a state establishes water quality standards, it must also "compile a list of waters . . . that do not meet those standards," known as a "§ 303(d) list" or an impaired waters list. *Thomas v. Jackson*, 581 F.3d 658, 661 (8th Cir. 2009) (citing 33 U.S.C. § 1313(d)); *see also Blue Water Baltimore v. Pruitt*, 266 F. Supp.3d 174, 176 (D. Md. 2017). Naming a particular body of water an "impaired" water is significant because it triggers a further obligation: "For each water on the § 303(d) list, the state must establish total maximum daily loads," (TMDLs) "of certain 'pollutants' that the water can sustain without exceeding water quality standards." *Thomas*, 581 F.3d at 662 (citing 33 U.S.C. §§ 1313(d)(1)(C), 1362(6)).

States identify their impaired waters and establish their TDMLs by "submitting biennially an Integrated Report to the EPA." *Blue Water Baltimore*, 266 F. Supp.3d at 176. Developing the Integrated Report is an interactive process, which, by law, must include public participation– "that part of the decision-making process through which responsible officials become aware of public attitudes." 40 C.F.R. § 25.3(b).

During reporting years, Ohio EPA invites public participation by releasing a draft of its Integrated Report for a period of public comment. After affording "ample opportunity for interested and affected parties to communicate their views," *id.*, the State Agency considers the public comments, revises the Report and submits the final version to the U.S. EPA.

Within thirty days of submission, the U.S. EPA must then either approve or disapprove the state's § 303(d) list. 33 U.S.C. § 1313(d)(2).

While the U.S. EPA has a measure of discretion in approving or disapproving a state's impaired waters list, regulations under the CWA limit its discretion: the Agency "*shall* approve a list developed under [§ 303(d)] that is submitted . . . *only* if it meets the requirements of § 130.7(b)." 40 C.F.R. § 130.7(d)(2) (emphasis added). One of those requirements is that the state "assemble and evaluate *all* existing and readily available water quality-related data and information" regarding the listed impaired waters. 40 C.F.R. § 130.7(b)(5) (emphasis added).[6]

If the state's § 303(d) list successfully "assemble[s] and evaluate[s] all" relevant data, and the U.S. EPA approves it, the state "shall incorporate" the § 303(d) list and any TDMLs "into its current continuing planning process." *Hayes v. Whitman*, 264 F.3d 1017, 1021 (10th Cir. 2001) (quoting 33 U.S.C. § 1313(d)(2) (brackets omitted)).

If, on the other hand, the U.S. EPA disapproves the list, the federal government must, per the CWA, assume the state's responsibilities, so that the U.S. EPA must "identify [the impaired] waters in [the s]tate and establish" its TMDLs "no[] later than thirty days after the date of such disapproval." *Blue Water Baltimore*, 266 F. Supp.3d at 177 (quoting 40 C.F.R. § 130.7(d)(2)).

Maintaining that the U.S. EPA wrongly approved Ohio's 2016 § 303(d) list, plaintiffs urge me to set aside that approval, order the Agency to disapprove Ohio's § 303(d) list, "and

---

[6]Alternatively, 40 C.F.R. §130.7(b)(6)(iii) permits a state to offer "rationale for any decision not to use any existing and readily available data and information" regarding its impaired waters, subject to EPA approval. "However," as the U.S. EPA has said, "a state's decision not to rely on such data or information for a listing decision is separate from its threshold obligation to assemble and evaluate all existing and readily available water-quality related information." (Doc. 19-1, ID 8896).

As previously noted, the Ohio EPA expressly refused to "assemble and evaluate all existing and readily available water quality-related data and information" regarding Lake Erie's open waters in its 2016 impaired waters list. 40 C.F.R. § 130.7(b)(f). Even so, the U.S. EPA approved it, along with Ohio's 2016 Integrated Report.

identify the open waters of Lake Erie as impaired within [thirty] days of disapproval as required by Section 303(d) of the Clean Water Act." (Doc 1, ID 37).

## 2. Ohio's Noncompliance With the CWA

Although the instant dispute concerns Ohio's 2016 impaired waters list, the State's hesitance in deciding whether to declare the open waters of Lake Erie impaired dates back to 2012.

That year, the U.S. EPA saved the Ohio EPA the trouble of independently investigating Lake Erie's open waters by providing it with "water quality-related" data the EPA already collected from the area. Nevertheless, "[a]fter careful consideration," the Ohio EPA "decided not to add Lake Erie to the 2012 [§] 303(d) list because the data were not received by the submission date for consideration of external data," and Ohio EPA had "no methodology" to evaluate it. (Doc. 26-1, ID 8987). The Ohio EPA assured the U.S. EPA that it would "consider" listing the Lake's open waters as impaired during the next cycle, in its 2014 Integrated Report. (*Id.*).

However, in disregard of that express assurance, the Ohio EPA did not do so.

Instead, Ohio's 2014 Report listed the Lake Erie shoreline as impaired due to excess microcystin, but the State's "Section 303(d) list . . . d[id] not include the waters beyond the shoreline . . . where the Toledo and Oregon [water] intakes are located," even though "[s]*ampling results from water intakes for Toledo and Oregon . . . exceed*[ed] *Ohio's microcystin threshold.*" (A.R. 2713) (emphasis supplied).

The U.S. EPA sent a letter to the Ohio EPA on August 7, 2015,[7] pointing out this discrepancy, and "partial[ly]" approving the 2014 Integrated Report. The Federal Agency told

---

[7] The EPA sent its letter just over a year after Toledo's three-day water crisis had ended on August 3, 2014.

Ohio it was "deferring its final decision on whether the waters beyond the shoreline . . . should be on Ohio's Section 303(d) list for impairment of . . . designated use [as a public water supply] due to microcystin." (*Id.*). Notably, the U.S. EPA specifically attributed its deferral to Ohio's promise to add more assessment units "that would expand coverage to all drinking water intakes in the [Western Lake Erie Basin] for the next listing cycle." (*Id.*).

Elsewhere in the letter, the U.S. EPA also "note[d] that Ohio ha[d] not assessed Lake Erie with respect to the State's narrative criteria at OAC 3745-01-04(E), prohibiting . . . nuisance growths of algae created by nutrients entering the water as a result of human activity." (A.R. 2728). "Given the prevalence of HABs" on Lake Erie, the U.S. EPA urged the State "to develop a methodology for assessing . . . the nuisance algal growth narrative water quality criteria." (*Id.*) It also instructed Ohio to "consider the impact of HABs and nuisance algal growth on aquatic life use, in addition to the impacts on recreational use," as part of its "future assessment[s]." (*Id.*).

Finally, the U.S. EPA reiterated in its August 7, 2015 letter that it "expect[ed] Ohio EPA to fully assess the ten [assessment units] for Lake Erie and to assemble and evaluate all existing and readily available data, including EPA data, for the 2016 integrated report and listing cycle." (A.R. 2727).

The Federal Agency had, in effect, given Ohio a pass despite the deficiencies in the State's 2012 *and* 2014 § 303(d) lists. Doing so, the U.S. EPA also gave the Ohio EPA both the opportunity and a mandate to cure those deficiencies and otherwise fulfill its CWA obligations.

Yet in the years that followed, Ohio ignored that opportunity and its duties.

To be sure, in the draft 2016 Integrated Report, Ohio EPA listed, in light, no doubt, of the 2014 Toledo water crisis, its Lake Erie shoreline "assessment units" as impaired "for aquatic life

11

use, public drinking water use and human health (fish contaminants)." But the Ohio EPA, playing a game of administrative pushball, *expressly declined* "to pursue development of the open water assessment units and methods at this time." (A.R. 3451). Rather, because Lake Erie "is bordered by four states and one Canadian province," "Ohio EPA believe[d] that assessment and listing of the open waters under the CWA should be led by U.S. EPA in consultation with the states." (*Id.* at 3450-51).

This "belie[f]" is contrary to the CWA, which assigns to the "*states . . . the primary role . . . in establishing water quality standards.*" *Natural Resources Defense Council, Inc. v. EPA*, 16 F.3d 1395, 1401 (4th Cir. 1993) (citation omitted) (emphasis partially supplied). The Federal "EPA's sole function, in this respect, is to review those standards for approval"; it steps in to establish water quality standards on a state's behalf not as a first step, but only as a last resort, when the state has failed to do so. *Defenders of Wildlife*, *supra*, 415 F.3d at 1124 (citation omitted). Such a process is "consistent with the basic goals and policies that underlie the Clean Water Act–namely, that states remain at the front line in combating pollution." *Barnum Timber Co v. EPA*, 835 F. Supp.2d 773, 780–81 (N.D. Cal. 2011) (quoting *City of Arcadia v. EPA*, 411 F.3d 1103, 1106 (9th Cir. 2005)).

The U.S. EPA explained as much in an August 29, 2016 letter to the Ohio EPA rejecting the draft 2016 impaired waters list and the State's "belie[f]" that the U.S. EPA should do all the heavy lifting:

> We note that the responsibility to assess Ohio's waters, including the State's open waters of Lake Erie, and determine whether or not they are meeting Ohio's water quality standards, is specifically a state responsibility under the CWA. . . EPA's role is to review and either approve or disapprove the state's list of impaired waters.

(A.R. 2469 (statutory and regulatory citations omitted)).

In the same letter, the U.S. EPA directed Ohio to "assess all of its waters in the Western and Central Basins of Lake Erie for all applicable water quality standards," including the state's own narrative criteria prohibiting "nuisance" algae:

> Such standards should include numeric criteria, narrative criteria, water body uses and antidegradation requirements. In particular the state should assess against its narrative standard at [OAC] 3745-1-04(E):
>
> *The following general water criteria shall apply to all surface waters of the state including mixing zones. To every extent practical and possible as determined by the director, these waters shall be . . . (E) Free from nutrients entering the waters as a result of human activity in concentrations that create nuisance growths of aquatic weeds and algae.*

(*Id.*).

Ohio refused.

In a September 30, 2016 responsive letter, Ohio reiterated its "firm and consistent position" that "all states and countries surrounding and contributing to the problems in Lake Erie should, with leadership from our national EPA, develop a coordinated response." (A.R. 2473). It dismissed the U.S. EPA's request to develop its own standards as "absurd." (*Id.* at 2474).

The Ohio EPA submitted its final 2016 Integrated Report to the U.S. EPA on October 20, 2016. (A.R. 3349). Like the initial draft, the final Report listed only the shoreline units of Lake Erie as impaired, and reasserted Ohio's refusal to assess the Lake's open waters. (Doc. 1-7, ID 145).

### 3.  The U.S. EPA Response to the 2016 Final Report: Compounding Inaction with More Inaction

The Ohio EPA was not alone in its noncompliance with its statutory mandate.

Although the CWA requires the U.S. EPA to approve or disapprove a state's § 303(d) list within thirty days, *see* 33 U.S.C. § 1313(d)(2), the U.S. EPA, in response to Ohio's 2016 impaired waters list, did neither.

Despite Ohio's unmistakable failure to do what it promised the U.S. EPA it would do after 2014, and what the U.S. EPA itself told Ohio to do following receipt of the 2016 draft Report, the U.S. EPA did not act on Ohio's final 2016 Integrated Report or its § 303(d) list *at all* for nearly five months. When the U.S. EPA finally did act, it was clear that, so far as the Agency was concerned, none of Ohio's persistent failings mattered: on March 31, 2017, the Federal Agency sent notice to the Ohio EPA that it would proceed with "formal approval under a separate [forthcoming] letter." (A.R. 3349).

The Agency's notice forthrightly acknowledged that "Ohio has yet to assess the open waters of Lake Erie for algal impairment," but expressed its "understanding and expectation that Ohio will continue to evaluate options to assess open waters of the Western Basin of Lake Erie based on relevant information, including *microcystin* data, for the 2018 [§] 303(d) list." (*Id.*).

### 4. The Course of This Litigation

After nearly another two months had passed without any "separate" "formal approval" letter from the U.S. EPA, plaintiffs the Environmental Law and Policy Center, Michael Ferner, and Susan Matz filed their first suit against the U.S. EPA, its Administrator Scott Pruitt, and Acting Regional Administrator, Scott Kaplan.

In their complaint, plaintiffs alleged the "U.S. E.P.A. [wa]s in violation of the CWA because it failed to perform its nondiscretionary duty to approve or disapprove Ohio EPA's [§] 303(d) List within 30 days after the date of submission." *See Environmental Law and Policy*

*Center et al. v. EPA, et al.*, No. 3:17-cv-01032 (N.D. Ohio) (Doc. 1, ID 11). They sought an order compelling the U.S. EPA to either approve or disapprove Ohio's 2016 impaired waters list as statutorily required.

As sometimes happens, filing suit got results–sort of: two days after plaintiffs filed their complaint, the U.S. EPA issued its formal approval, which "deferred to the State's judgment not to assess the open waters of the Western Basin of Lake Erie for the 2016 list." (A.R. 3371). With the U.S. EPA's decision now final, plaintiffs voluntarily dismissed their initial complaint, which the Agency's action had mooted.

Two months later, plaintiffs filed the present suit against the same defendants.

This time around, plaintiffs challenge the substance of the U.S. EPA's decision to approve Ohio's 2016 impaired waters list despite the State's failure to assess Lake Erie's open waters. The U.S. EPA's approval of the Ohio Report is unsustainable, plaintiffs contend, because the Ohio EPA refused to "assemble and evaluate all existing and readily available water-quality related data and information" concerning the Lake. *See* 40 C.F.R. § 130.7(b)(5). And, because the U.S. EPA could approve Ohio's § 303(d) list "only if" the State met that requirement, *see* 40 C.F.R. § 130.7(d)(2), plaintiffs maintain the U.S. EPA's approval of Ohio's 2016 impaired waters list was arbitrary and capricious–in laymen's terms, indisputably wrong.

On receiving the case, I set a January 16, 2018 deadline for summary judgment motions.

Then, on January 15, 2018, a federal holiday, and the day before that deadline, the U.S. EPA notified plaintiffs' counsel that it had "reevaluated [Ohio EPA's] submission and determined that the submission is incomplete and thus not fully consistent with the requirements of Section 303(d) of the Clean Water Act." Accordingly, the U.S. EPA stated that it was

"withdrawing the . . . approval [decision] specifically with respect to the open waters of Lake Erie." (Doc. 19-1, ID 8896) (Withdrawal Letter). [8]

Confessing its error, the U.S. EPA's Withdrawal Letter adopted and endorsed the same argument plaintiffs laid out in their complaint: "Specifically, the State's submission does not demonstrate that the State has satisfied its statutory and regulatory obligations to assemble and evaluate all existing and readily available data and information regarding nutrients in the open waters of Lake Erie within the State's boundaries." (*Id.*).

Even so, the U.S. EPA was remarkably willing to give Ohio yet another unearned chance to do what it should have done almost six years ago: "consistent with its obligations" under the CWA, the Federal Agency once again asked the Ohio EPA to evaluate and assemble all existing and readily available data "and submit the results of that evaluation . . . including, if appropriate, an assessment of whether the waters are meeting the applicable water quality standards" to the U.S. EPA by April 9, 2018, so that it could reconsider its initial approval. (*Id.* at 8897).

In view of the U.S. EPA's sudden about face, I requested supplemental briefing and scheduled oral argument.

---

[8] I am concerned, first, that the U.S. EPA did not inform plaintiffs that it was withdrawing its approval of Ohio's 2016 § 303(d) list until the eleventh hour and fifty-ninth minute before their motion for summary judgment was to be filed.

I am concerned, second, that the U.S. EPA did not inform me that it was withdrawing its approval of Ohio's 2016 § 303(d) *at all*, either formally through a court filing or informally by email or otherwise. I only learned about the Agency's action after plaintiffs' counsel notified the Clerk about this significant change in circumstances. Defendants' oversight amplifies the whiff of bad faith arising from the timing of its inexplicably delayed notice to plaintiffs' counsel.

Moreover, as the Agency well knew, by withdrawing its approval, there is no final Agency action subject to judicial review under the APA, which prevents me from adjudicating the merits of the plaintiffs' motion for summary judgment.

On the date of the argument, March 6, 2018, unbeknownst to counsel or me, the Ohio EPA responded to the U.S. EPA's request for further information. The March 6 letter gave no additional "existing and readily available" water quality-related data or information, but said the Ohio EPA was developing a system to "assess[] the open waters of Lake Erie in [its] upcoming 2018 Integrated Report." (Doc. 26-1, ID 8983).

## 5. Discussion

"The only recognized avenue for challenge to the substance of EPA's actions taken with respect to state [§ 303(d) list] submissions is a suit under the Administrative Procedure Act." *Scott v. City of Hammond*, 741 F.2d 992, 995 (7th Cir. 1984) (per curiam). That is the nature of the claim plaintiffs assert here.

Section 706 of the APA directs me to "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs argue that the U.S. EPA's decision to approve Ohio's 2016 impaired waters list was arbitrary and capricious, especially in light of the Agency's years-long tolerance of incomplete 2012 and 2014 lists. This is so, plaintiffs contend, because Ohio failed (indeed, expressly refused) to "assemble and evaluate all existing and readily available water quality-related data and information" regarding Lake Erie's open waters *see* 40 C.F.R. § 130.7(b)(5). The U.S. EPA could approve the State's § 303(d) list "only if" Ohio satisfied this requirement, *see* 40 C.F.R. § 130.7(d)(2). Since the State Agency did not do so, plaintiffs maintain that the U.S. EPA's approval of Ohio's 2016 impaired waters list was in error.

Plaintiffs make a forceful point.

Here, the U.S. EPA approved Ohio's § 303(d) list while concurrently acknowledging that Ohio "has yet to assess the open waters of Lake Erie for algal impairment," and thus, "has yet" to assemble and evaluate all existing and readily available data regarding Lake Erie's open waters. Even if not arbitrary and capricious, that decision raises considerable doubt as to whether it is "in accordance with the law," 5 U.S.C. § 706(2)(A), which permits the U.S. EPA to approve the list "only if" 40 C.F.R. § 130.7(d)(2), Ohio first assembles and evaluates such data, which Ohio admittedly did not do.

The problem is, however, that the U.S. EPA revoked that action when it issued the Withdrawal Letter–"withdrawing the . . . approval [decision] specifically with respect to the open waters of Lake Erie." (Doc. 19-1, ID 8896). The present status of this case therefore leaves me without a final agency action to review–and a plaintiff "does not state a viable [APA] claim against the EPA" absent a disputed "final agency action." *Marquette Cty. Rd. Comm'n v. EPA*, 188 F. Supp.3d 641, 646–47 (W.D. Mich. 2016); *see also* 5 U.S.C. § 704.[9]

Seeking to overcome the impediment that the lack of a final agency action erects, plaintiffs make two arguments. Neither persuades me to somehow go over, under, or around that statutory barrier.

First, they contend the U.S. EPA's Withdrawal Letter is not a withdrawal for reconsideration, but instead a *de facto* and *de jure* final action and judicially reviewable disapproval. This is so, they argue, because the statue's plain terms give the U.S. EPA only two

---

[9] More specifically, APA §704 authorizes judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. The U.S. EPA's approval of Ohio's 2016 impaired waters list is a "final agency action for which there is no other adequate remedy in court," *id.*, as neither party contends that the Agency's decision is reviewable by statute. *See also Scott*, *supra*, 741 F.2d at 995–96.

options: "The Administrator *shall either approve or disapprove*" a state's § 303(d) list "not later than thirty days after the date of submission." 33 U.S.C. § 1313(d)(2) (emphasis added).[10]

I cannot agree.

For one, the U.S. EPA enjoys inherent authority to reconsider prior decisions. *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 416 (6th Cir. 2004). "Even where there is no express reconsideration authority [in the governing statute], the general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision." *Belville Mining Co. v. United States*, 999 F.2d 989, 997 (6th Cir. 1993).[11] While I may not approve of the U.S. EPA's handling of

---

[10] If the U.S. EPA's Withdrawal Letter were a statutory disapproval, plaintiffs, I am sure, would not want me to vacate that decision, but merely affirm it and remand back to the U.S. EPA with an order directing defendants to "identify [impaired] waters in . . . [Ohio] and establish" TDMLs "for such waters." 33 U.S.C. § 1313(d)(2).

[11] Plaintiffs' counsel claimed at oral argument that the seven-month delay between the U.S. EPA's approval of the 2016 Integrated Report, and its withdrawal of approval went well beyond the "reasonable" window for reconsideration. The weight of the factual circumstances favor her argument.

The U.S. EPA had reason to apprehend that Ohio's 2016 § 303(d) list was legally insufficient shortly after Ohio filed it on October 20, 2016. After all, the U.S. EPA had earlier reviewed the draft 2016 Report and sent the Ohio EPA a detailed letter instructing the Sate Agency to assemble and evaluate all existing and readily available water quality-related data relative to Lake Erie's open waters and algal growths. In response, the Ohio EPA rejected that instruction outright. It then submitted its 2016 final Integrated Report repeating the same § 303(d) list discussion from the draft Report.

Instead of disapproving Ohio's incomplete impaired waters list, or taking any other appropriate action under the CWA, the U.S. EPA took roughly five months to issue an unfounded decision "formal[ly] approv[ing]" the list, and then *another seven months* to withdraw the approval. And, in each instance, plaintiffs' lawsuits triggered the Federal Agency's actions.

However, precedent cautions against doing as plaintiffs ask and concluding that the earlier approval still stands. The "reasonable time" measure runs from the date of the agency's initial

Ohio's 2016 Integrated Report, I "prefer[] to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources." *Minetau*, 375 F.3d at 417 (citation omitted).

For another, even if I agreed that the EPA's withdrawal is a disapproval in the colloquial sense,[12] I cannot agree that, *de jure*, it constitutes a "final agency action" for APA purposes. *See* 5 U.S.C. § 704.

An agency action is "final" if it "mark[s] the 'consummation' of the agency's decisionmaking process," and if it is "one by which 'rights or obligations have been determined,

---

decision, to its notice of suspension and reconsideration. *Belville Mining v. United States*, 999 F.2d 989, 1000–01 (6th Cir. 1993). Where an agency's "attempt[] to correct legally erroneous . . . determinations that, left uncorrected, would be vulnerable to court challenge . . . [is] the basis for reconsideration," the Sixth Circuit has said eight months is not an unreasonable period of time to reconsider a decision. *Id.* at 997–1000.

Moreover, while the conduct of the U.S. EPA *vis-à-vis* Ohio's 2016 Integrated Report manifested an apparently obdurate determination not to do its job, two circumstances persuade me that remand is the best course in this case.

First, it is the most prudent option. If I were to find that, despite the Withdrawal Letter, the initial approval stands as the Agency's final action, an appeal and yet more delay would likely follow, regardless of whether I vacated or affirmed the Agency's decision.

Another reason is that remand may well lead to the result the plaintiffs have sought all along: disapproval of Ohio's 2016 impaired waters list. In giving credit to that possibility, I accept statements by the Federal Agency's lawyers, who themselves suggested remand during oral argument, as a signal that there is good reason to expect that remand will lead to disapproval of Ohio's 2016 impaired waters list. If so, after years of inaction by both the State and Federal EPAs, proverbial first step of a 1000 mile journey will have, at long, and long overdue last, have been taken.

[12] The Withdrawal Letter states the "EPA *has reevaluated* the State's submission and determined that the submission is incomplete and thus not fully consistent with the requirements of" the CWA. (Doc. 19-1, ID 8896) (emphasis supplied). If the U.S. EPA has already "reevaluated" Ohio EPA's submission and found it "incomplete," and inconsistent with the CWA, then what's left to "reconsider"? Nonetheless, I accede to the Agency's assertion that, whatever it is doing, it is within the lawful ambit of its "inherent authority" to reconsider its prior actions. *Minetau*, *supra*, 375 F.3d at 416–17.

or from which 'legal consequences will follow.'" *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 495–96 (6th Cir. 2014) (citations omitted). The U.S. EPA's Withdrawal Letter is neither.

It is not the "consummation" of the U.S. EPA's decisionmaking process, because it calls for Ohio to submit further information, after which the U.S. EPA intends to issue a further approval or disapproval decision. Nor is the Withdrawal Letter an action from which "legal consequences will follow"–legal consequences will follow only after the U.S. EPA issues a final approval or disapproval, at which point either the Ohio EPA will implement the restrictions from the approved 2016 § 303(d) list, or the U.S. EPA shall begin the process of "identify[ing] such [impaired] waters in [Ohio]," and establishing their TMDLs. 33 U.S.C. § 1313(d)(2). As it now stands under the Withdrawal Letter, no "rights or obligations have been determined." *Jama*, *supra*, 760 F.3d at 495–96 (citation omitted).

Plaintiffs alternatively reason that if the withdrawal is not a final action, then it must constitute further inaction, which is grounds for a "citizen suit" against Administrator Pruitt for failing to discharge his nondiscretionary, mandatory duty to choose between his binary options to approve or disapprove Ohio's § 303(d) list within thirty days of submission. *See* 33 U.S.C. §§ 1313(d)(2), 1365(a)(2).[13]

While that may be correct, it is not the claim plaintiffs' asserted in their pending complaint, and plaintiffs are not entitled to bring new causes of action in response to defendants'

---

[13] Under the CWA, "any citizen may commence a civil action on his own behalf . . . against the Administrator where there is an alleged failure of the Administrator to perform any [nondiscretionary] act or duty." 33 U.S.C. § 1365(a)(2). This is the avenue plaintiffs pursued in their initial suit against defendants when the U.S. EPA failed (for nearly five months) to approve or disapprove Ohio's 2106 impaired waters list.

counter-motion for summary judgment. *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005).

Even more to the point, plaintiffs cannot sue the U.S. EPA for failing to discharge a nondiscretionary duty without first giving sixty days' notice of the alleged violation to "the [EPA] Administrator," the "State in which the alleged violation occurs," and "any alleged violator." 33 U.S.C. § 1365(b)(1)(A). Strict "compliance with the[se] notice and delay provisions . . . is a mandatory condition precedent to the commencement" of a citizen suit. *Historic Green Springs, Inc. v. Louisa Cty. Water Auth.*, 833 F. Supp.2d 562, 565 (W.D. Va. 2011) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 399 (4th Cir. 2011)). Because plaintiffs did not provide sixty days' notice before initiating this suit, they cannot now transform their APA claim into a CWA claim for failure to perform a nondiscretionary duty.

There presently being no final agency action to review, plaintiffs cannot prove an essential element of their claim. *See, e.g.*, *Marquette Cty. Rd. Comm'n*, *supra*, 188 F. Supp.3d at 658 ("Plaintiff fails to state a claim against the EPA . . . because the EPA's actions are not reviewable under the APA."). What's more, with no authority to direct the U.S. EPA to act on Ohio's 2016 § 303(d) list, I cannot at this point order the relief they seek in any event. For these reasons, I deny plaintiffs' motion for summary judgment.

## Conclusion

Defendants' legal maneuvering prevents me from ruling on the merits in this case, but Ohio's "incomplete" "Section 303(d) List submission" remains pending before the U.S. EPA for either final approval or disapproval. (Doc. 19-1, ID 8896). Thus, I have authority to "remand the

22

case to the agency so that the agency may take further action consistent with the correct legal standards." *Mineta*, *supra*, 375 F.3d at 416 (citation omitted).

On March 6, 2018, the Ohio EPA responded to the U.S. EPA's request for further information, giving the Federal Agency nothing further to consider.[14] The State's § 303(d) list therefore stands as initially submitted in Ohio's 2016 Integrated Report, with the March 6 letter triggering the U.S. EPA's thirty-day-timeline for approval, or disapproval of the 2016 impaired waters list. 33 U.S.C. § 1313(d)(2); 40 C.F.R § 130.7(d)(2).

Unfortunately, however, the initial thirty-day-timeline (which would have ended April 5, 2018,) has already passed. And I acknowledge the uncertainty of the present litigation may have interfered with the U.S. EPA's decisionmaking procedures.

Accordingly, I permit the U.S. EPA to render its approval or disapproval of Ohio's 2016 § 303(d) list within thirty days of the date I enter this order. I anticipate that the U.S. EPA "*shall*" timely comply with this statutory duty, 33 U.S.C. § 1313(d)(2) (emphasis added), and I remand to the Agency to move forward with that process.

---

[14] I take judicial notice of Ohio's March 6 2018 letter, and incorporate it by reference into the record in anticipation that the U.S. EPA will consider it on remand. I do the same for Michigan's 2016 Integrated Report, which "designated [Michigan's] entire contiguous portion of Lake Erie as impaired . . . based on 'persistent significant algal blooms' . . . causing 'nuisance conditions related to nutrient expression.'" (Doc. 18, ID 8721). Further, I also take notice that on March 22, 2018, the Ohio EPA released its draft 2018 Integrated Report for public comment. (*See* Doc. 28). Finally, for the first time an Ohio EPA Report, whether draft or final, "is proposing to designate the open waters of Lake Erie's Western Basin . . . as impaired for recreation due to harmful algae and drinking water due to occurrences of microcystin." *See* Ohio Environmental Protection Agency News Release, *Ohio EPA Issues Latest Water Quality Report* (March 22, 2018) http://epa.ohio.gov/News/OnlineNewsRoom/NewsReleases/TabId/6596/ArticleId/1300/language /en-US/ohio-epa-issues-latest-water-quality-report-2018.aspx (last accessed April 5, 2018).

In the meantime, I retain jurisdiction over this suit and all matters affecting it.[15]

Concurrently, I withhold my ruling on defendants' counter-motion for summary judgment.

---

[15] I consider remand and retention of jurisdiction to be appropriate so that I can undertake judicial review under the APA, if needed, following whatever action the U.S. EPA takes.

Ohio's final 2018 Report may, or may not complete the *volte face* as to the listing of Lake Erie's open waters as impaired in its draft 2018 Report. In the meantime, however, many months may pass between the close of the public comment period (now set for May 4, 2018,) and the State Agency's submission of the final 2018 Report to the U.S. EPA.

Further, even if Ohio finally completes an about face as to its 2018 impairment listing, that does not moot or reduce the need for me to retain jurisdiction. *See Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp.2d 50, 51 n.1 (D.D.C. 2010) (claims challenging agency action are mooted only when the agency takes subsequent action superceding the disputed decision). If the U.S. EPA disapproves the 2016 listing, that should get the TMDLs determination process underway (and done, in light of the thirty-day deadline for completion of that process *see* 33 U.S.C. § 13133(d)(2); 40 C.F.R. § 130.7(d)(2)) sooner than it would following approval of a 2018 impairment listing in Ohio's 2018 Report.

 Moving sooner, even relatively slightly, rather than later matters. TMDL determination is but the first step; thereafter, restoration and remediation of Lake Erie to Ohio's water quality standards, could, according to U.S. EPA counsel at oral argument, take from eight to *twenty-three* years. Remediation of farmland runoff, the primary source of the Lake's algae/microsystin problem, is vastly more difficult than remediation of point source pollution. Thus, for this reason, at least, the 2016 listing remains at issue.

Finally, I take judicial notice that in 1988, the Ohio General Assembly prohibited the sale of "household laundry detergent[s] containing phosphorus in any form in excess of one-half percent by weight," effective "January 1, 1990." Ohio Rev. Code § 6111.10. Likewise, in 2008 the General Assembly imposed a similar prohibition against the sale of phosphorus-containing dishwashing detergents effective "July 1, 2010." Ohio Rev. Code § 6111.11.

Legislative action of this sort appears to be the most expeditious and effective means of accomplishing the goals of the CWA. More importantly, it could probably do so in substantially less time than the potential twenty-three years it will otherwise take. Just as science and industry appear to have worked together to meet the two-year deadlines set by the General Assembly for limiting phosphorus in household cleaning products, one would hope science and agriculture could also work together to reduce phosphorus in fertilizers, within a deadline the General Assembly with due deliberation could set.

It is, therefore,

ORDERED THAT:

1. Plaintiffs' motion for summary judgment (Docs. 18, 21) be, and the same hereby is, denied, without prejudice;

2. This case be, and it hereby is remanded to the defendant United States Environmental Protection Agency for further proceedings consistent with this Order and provisions and regulations, as applicable, of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*;

3. Defendants' counter-motion for summary judgment (Doc. 22) be, and the same hereby is, held in abeyance pending further proceedings; and

4. The parties shall submit status report(s) by May 15, 2018, or sooner in the event of any relevant action by the United States Environmental Protection Agency.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

That would mean that much sooner, rather than later, the right of all persons dependent upon a clean, toxic-algae-free Lake Erie for access to safe drinking water could be accomplished and guaranteed.