**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Environmental Law and Policy Center, *et al.*,                    Case No. 3:17CV1514

                                    Plaintiffs,

                    v.                                                    **ORDER**

United States Environmental Agency, *et al.*

                                    Defendants.


This case concerns the Clean Water Act (CWA) 33 U.S.C. § 1251 *et seq.*, and Ohio's long-standing, persistent reluctance and, on occasion, refusal, to comply with the CWA. As a result of the State's inattention to the need, too long manifest, to take effective steps to ensure that Lake Erie (the Lake) will dependably provide clean, healthful water, the risk remains that sometime in the future, upwards of 500,000 Northwest Ohio residents will again, as they did in August 2014, be deprived of clean, safe water for drinking, bathing, and other normal and necessary uses.

The principal problem is that for years, with varying degrees of intensity, summertime Harmful Algae Blooms (HABs) have afflicted the Lake's Western Basin. There is no dispute – not even on the part of Ohio's elected and appointed officials – that HABs result from unregulated and uncontrolled phosphorus-containing runoff from farmland in the watersheds of the Lake's northwestern tributaries.

HABs present a significant threat to public safety because they can produce microcystin– a "cyanotoxin" hazardous to "humans, animals, and ecosystems." (Doc. 29, ID 9001). The effects

of the ongoing phosphorus pollution and annual HABs has not been limited to the August 2014 Toledo Water Crisis. Those effects, albeit to a lesser degree, have also impacted everyone who relies on the Lake not just for drinking water, but for recreation and their livelihoods.

That crisis and those effects notwithstanding, the Ohio Environmental Protection Agency (Ohio EPA) failed in 2014 and again in 2016, to determine, as the CWA requires, whether Lake Erie's open waters met the State's own water quality standards. *See* 33 U.S.C. § 1313(d).

Ohio's failure in 2016 to list Ohio's Lake Erie open waters as "impaired" led the plaintiffs, the Environmental Law and Policy Center, Advocates for a Clean Lake Erie, and private citizens Michael Ferner and Susan Matz, to file this suit against the United States Environmental Protection Agency (U.S. EPA or the Agency), acting Administrator Andrew Wheeler, and Regional Administrator Cathy Stepp.[1] Their suit sought reversal of the U.S. EPA's decision to approve, despite the omission of Lake Erie's open waters, Ohio's impaired waters list.

Three motions are pending: defendants' counter-motion for summary judgment (Doc. 38); plaintiffs' motion for leave to supplement their initial complaint (Doc. 36); and intervenor the Lucas County Board of Commissioners' motion to join the case as a party plaintiff (Doc. 56).

For the reasons that follow, I grant defendants' counter-motion for summary judgment, deny leave to plaintiffs to supplement the complaint, and deny leave to the Lucas County Board of Commissioners to intervene.[2]

---

[1] When a public officer "resigns[] or otherwise ceases to hold office" during the pendency of a civil action against him, his "successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). Wheeler and Stepp succeeded originally named defendants Scott Pruitt and Scott Kaplan.

[2] Also, at the end of this order, I set a briefing schedule for plaintiffs' motion for attorneys' fees. (Doc. 57).

**Background**

**1.  Ohio's 2012, 2014, and 2016 Reports,
the U.S. EPA Responses, and Ohio's Inaction**

The CWA's biennial reporting provision (the § 303(d) list) requires the states to submit to the U.S. EPA a "listing of the state's impaired waters" *i.e.*, "a list of waters that do not currently attain, and based on current pollution controls are not expected to attain, applicable water quality standards." *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 215 (D. D.C. 2011) (citing 40 C.F.R. § 130.7(b)(3) & (d)); *see also e.g.*, *Hayes v. Whitman*, 264 F.3d 1017, 1021 (10th Cir. 2001) (describing the duty to create an impaired water,s or § 303(d), list) (citing 33 U.S.C. § 1313(d)(2)).

In 2012, the U.S. EPA provided Ohio with "water quality-related" data from Lake Erie's open waters in a direct effort to encourage Ohio to engage in water quality assessment. (Doc. 29, ID 9006). Ohio nonetheless declined to evaluate the area for that year's § 303(d) list.

In 2014, the year of the Toledo Water Crisis, the Ohio EPA designated assessment units in Lake Erie's shoreline as impaired. But, once again, the Ohio EPA did not include the waters beyond the shoreline, *i.e.*, the Lake's open waters, on that list. The State did so despite alarming test results from Toledo and Oregon's water intake points – results that, not surprisingly, exceeded Ohio's own threshold limit for microsystin. (*Id.*).

While the U.S. EPA expressed concern at the omission, it approved Ohio's 2014 § 303(d) list with one caveat: based on Ohio's promise for the 2016 listing cycle to "expand coverage to all drinking water intakes in the Western Lake Erie Basin," the U.S. EPA deferred its final decision on whether waters beyond the shoreline should also be listed as impaired. (*Id.* at 9007).

In hindsight, even this conditional approval reflected an undue measure of confidence in Ohio's willingness to evaluate the condition of Lake Erie's open waters. Indeed, in preparing its 2016 impaired waters list, Ohio, despite its promise, gave no heed to the U.S. EPA's expectations.

Ohio's 2016 § 303(d) list identified more impaired shoreline assessment units, but explicitly declined "to pursue development of the open water assessment units and methods at this time." (*Id.* at 9009). When the U.S. EPA again reminded the State of its statutory obligations – pointing to the 2014 Toledo Water Crisis as a reason to be more proactive – Ohio refused. Instead, in derogation of its CWA-imposed duty to assess all the waters within its boundaries, Ohio reiterated its "firm and consistent position" that the U.S. EPA, rather than Ohio, should itself "develop a coordinated response" for Lake Erie. Ohio's EPA dismissed the Agency's instruction to fulfill its CWA obligations as "absurd." (*Id.*).

After failing to respond for seven months, and following plaintiffs' initial lawsuit against the U.S. EPA demanding that it, in accordance with the CWA, either approve or disapprove Ohio's 2016 § 303(d) list, the Agency issued a letter approving the State's 2016 § 303(d) list.

Plaintiffs then filed this, their second suit, challenging the substance of the Agency's approval decision. They argued the U.S. EPA's approval was untenable due to the Ohio EPA's express refusal to "assemble and evaluate all existing and readily available water-quality related data and information" relating to Lake Erie's open waters. 40 C.F.R. § 130.7(b)(5).

Rather than defending or reversing outright its approval of Ohio's 2016 impaired waters list, the U.S. EPA withdrew its approval for further consideration. In doing so, the Agency cited the very failing that had provoked plaintiffs' lawsuit: "Specifically, the State's submission does not demonstrate that the State has satisfied its statutory and regulatory obligations to assemble and

evaluate all existing and readily available data and information regarding nutrients in the open waters of Lake Erie within the State's boundaries." (*Id.* at 9012).[3]

The Agency's withdrawal of its approval meant that it had no longer taken final agency action on Ohio's deficient 2016 § 303(d) list. Consequently, the Administrative Procedure Act (APA), 5 U.S.C. § 704, compelled me to conclude that plaintiffs could not maintain their claim challenging that revoked decision. Thus, on April 11, 2018, I denied their motion for summary judgment. (Doc. 29). *Envt'l Law and Policy Ctr. v. United States Envt'l Protection Agency,* 2018 WL 1740146 (N.D. Ohio).

I remanded the case to the Agency for "further action consistent with the correct legal standards" within thirty days of that order and retained jurisdiction. I also withheld ruling on defendants' counter-motion for summary judgment – which I address in this order. (*Id.* at 9019).

## 2. Events Following The April 11, 2018 Order

Since April 11, 2018, the Ohio EPA has submitted an amended 2016 § 303(d) list, adding three new assessment units for Lake Erie's open waters, and declaring all three impaired. The U.S. EPA approved Ohio's amended 2016 submission (the Amended Submission) on May 10, 2018, just within the thirty-day deadline imposed in my order.[4]

---

[3] The Agency withdrew its approval for reconsideration of the 2016 § 303(d) list on the day before plaintiffs' summary judgment brief was due. The effect of the Agency's failing timely to alert plaintiffs' counsel that it was contemplating its action before counsel expended time and resources preparing that brief is a matter I will address once the plaintiffs' motion for attorneys' fees and costs is decisional.

[4] On July 9, 2018, the U.S. EPA approved Ohio's 2018 impaired waters list, which, again designated the open waters assessment units impaired. (Doc. 40-1).

While Ohio had hoped its Amended Submission would "resolve the pending litigation" (Doc. 30-2, ID 9027), the U.S. EPA's approval prompted plaintiffs to seek leave under Fed. R. Civ. P. 15(d) to supplement their complaint.

In support of that request, plaintiffs point out that although the Ohio EPA at last declared its new open waters assessment units impaired, it also "refused to develop . . . a 'Total Maximum Daily Load' [TMDL] for the phosphorus pollution that causes" HABs in Lake Erie. (Doc. 36, ID 9220).

Developing a TMDL is a bedrock obligation under the CWA. TMDLs "establish[] a maximum daily discharge of pollutants into waterway" and serve as "an important aspect of the federal scheme of water pollution control." *Scott v. City of Hammond*, 741 F.2d 992, 996–97 (7th Cir. 1984) (per curiam). States must establish a TMDL for certain pollutants "[f]or each impaired waterbody" they name on a § 303(d) list. *Hayes*, *supra*, 264 F.3d at 1021 (citing 33 U.S.C. § 1313(d)(1)(C)).

Creating TDMLs is, moreover, not optional. "Each State *shall* establish" TMDLs for particular pollutants identified by the Administrator under the CWA. 33 U.S.C. § 1313(d)(1)(C) (emphasis added). *See Scott*, *supra*, 741 F.2d at 998 n.13; *Alaska Ctr. for the Env't v. Reilly*, 762 F. Supp. 1422, 1427 (W.D. Wash. 1991) ("Congress' repeated use of the term 'shall' . . . clearly places a mandatory duty upon the EPA to take affirmative action after disapproving a state's unacceptable submission.").

Nonetheless, Ohio has affirmatively stated that it is not going to develop a TMDL for phosphorus runoff in Lake Erie's open waters – at least not right now.

"Given the complexity of the algae bloom problem," the Ohio EPA stated in its 2016 Amended Submission that it "believe[d] the best approach" for remediating Lake Erie "is through

the collaborative process established under Annex 4 of the Great Lakes Water Quality Agreement" (GLWQA). (Doc. 30-2, ID 9035). Ohio's "Domestic Action Plan" under the GLWQA includes "phosphorus reduction goals of 20 percent by 2020, and 40 percent by 2025. Th[is] plan is not intended to be static but to be revised following the adaptive management philosophy." (*Id.*).

Should this "collaborative process fail to restore" the Lake, the Ohio EPA "recognize[d] that a TMDL or other approach allowed by the U.S. EPA" may "ultimately be required" at some unspecified point in the future. (*Id.*).

## Discussion

### 1. Motion for Leave to Supplement the Complaint

Believing, based on Ohio's declared intent not to fulfill its duty under the CWA to develop a TDML, plaintiffs seek to supplement their complaint. (Doc. 36). Defendants oppose the motion. (Docs. 38, 39).

Rule 15(d) of the Federal Rules of Civil Procedure permits a party to supplement the pleadings to account for "any transaction, occurrence or event that happened after the date of the pleading to be supplemented." Standards for granting or denying leave to supplement under Rule 15(d) are the same as those for granting or denying leave to amend under Rule 15(a). *Mattox v. Edelman*, 851 F.3d 583, 592 (6th Cir. 2017); *Spies v. Voinovich*, 48 F. App'x 520, 527 (6th Cir. 2002).

Like any complaint plaintiffs' proposed supplemental complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs, asserting two alternative theories for relief, want to add a single claim challenging the U.S. EPA's May 10, 2018 response letter approving Ohio's Amended 2016 § 303(d) list.

First, plaintiffs argue the U.S. EPA's May 10, 2018 response is a final agency decision approving, not only Ohio's amended 2016 impaired waters list, but also the State's professed refusal to develop a TMDL for Lake Erie's open waters. Because the CWA demands that "[e]ach State shall establish" TMDLs for its impaired waters, 33 U.S.C. § 1313(d)(1)(C), plaintiffs allege, in Count I of the proposed supplemental complaint, that the U.S. EPA's approval of Ohio's no-TMDL plan was "arbitrary, capricious" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Alternatively, plaintiffs assert that, if the Agency's May 10, 2018 response is not a final agency action approving Ohio's no-TMDL plan, then the Agency has failed to act, and "any citizen may commence a civil action . . . against the Administrator" for failing to perform a nondiscretionary duty. 33 U.S.C. § 1365(a)(2). Specifically, plaintiffs allege the Agency had a nondiscretionary duty to reject the Ohio EPA's attempt to avoid developing a TMDL for Lake Erie's open waters.

This is the basis for the CWA citizen suit plaintiffs allege in Count II of the proposed supplemental complaint. Simply put, the CWA tells Ohio it "*shall*" establish TMDLs for those impaired waters, 33 U.S.C. § 1313(d)(1)(C) (emphasis added), and Ohio forthrightly states that it won't do so. In the face of that denial, plaintiffs assert, the Agency had to disapprove the amended 2016 impaired waters list.

Although I appreciate plaintiffs' frustration with Ohio's possible continuation of its inaction, I agree with defendants on the law. Counts I and II of the proposed supplemental

complaint fail under existing law to state claims against the Agency on which a court can grant relief.

Accordingly, I must deny the motion for leave to supplement.

### A. The U.S. EPA's May 10, 2018 Response Letter Does Not Approve Ohio's No-TMDL Plan

As with their initial claim arising from the U.S. EPA's later-revoked approval of Ohio's original 2016 § 303(d) list, plaintiffs' proposed supplemental complaint first alleges the U.S. EPA's May 10, 2018 letter approving Ohio's Amended 2016 submission is also a "final agency action" approving the State's claimed refusal to develop a TMDL. 5 U.S.C. § 704.

It is not. And presenting this erroneous "legal conclusion" as an allegation of fact gets plaintiffs no closer to stating a viable APA claim. *See Iqbal*, *supra*, 556 U.S. at 678–79 (courts are "not bound to accept as true a legal conclusion couched as a factual allegation"); *see also Marquette Cty. Rd. Comm'n v. EPA*, 188 F. Supp. 3d 641, 646–47 (W.D. Mich. 2016) (plaintiffs "do[] not state a viable [APA] claim against the EPA" absent a disputed "final agency action").

Defendants agree the CWA requires Ohio to establish TMDLs for each water quality segment it identifies on its § 303(d) list. 33 U.S.C. § 1313(d)(1); 40 C.F.R. § 130.7(c)(1). They also agree that, by designating Lake Erie's open waters as impaired, Ohio "trigger[ed] a statutory obligation to develop total maximum daily loads . . . which specify the absolute amount of particular pollutants the entire water body can take on while still satisfying water quality standards." *Anacostia Riverkeeper*, *supra*, 798 F. Supp. 2d at 216 (citing 33 U.S.C. § 1313(d)(1)(C)).

However, the U.S. EPA also emphasizes that these obligations are distinct. Section 1313(d)(1)(A) requires states to "identify" impaired waters; section 1313(d)(1)(C) then requires states to "establish" for each of those waters a TMDL. 33 U.S.C. § 1313(d)(1). And nothing in

the CWA requires a state to "simultaneous[ly] submit[t]" its list of impaired waters "with the TMDL[s] to correct each polluted water." *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 885 (9th Cir. 2002).

Regulations implementing § 303(d) require states to submit an impaired waters list every two years. 40 C.F.R. § 130.7(d)(1). States need only submit their proposed TMDLs to the EPA Administrator "from time to time." 33 U.S.C. § 1313(d)(2). More specific "[s]chedules for submission of TMDLS [are] determined by the Regional Administrator and the State," rather than federal regulation. 40 C.F.R. § 130.7(d)(1).

Unlike a § 303(d) list, which the federal government might reasonably expect from the states "biennially," *id.*, "TMDLs may require substantial time and resources to develop." *Ohio Valley Envtl. Coal., Inc. v. Pruitt*, 893 F.3d 225, 231 n.4 (4th Cir. 2018); *see also San Francisco BayKeeper*, *supra*, 297 F.3d at 885 ("The development of TMDLs to correct the pollution is obviously a more intensive and time-consuming project than simply identifying the polluted waters."). "EPA guidance [therefore] recommends that states establish TMDLs for all impaired waters on their Section 303(d) Lists within eight-to-thirteen years of the initial listing," while acknowledging that "'slightly longer' times may be needed depending on specific factors." *Ohio Valley Envtl. Coal.*, *supra*, 893 F.3d at 231 n.4

TMDL submissions also undergo a separate approval process. "Once a state submits a TMDL, EPA must approve or disapprove it within thirty days." *Id.* at 227 (citing 33 U.S.C. § 1313(d)(2)). "If EPA disapproves of a TMDL, EPA must develop, submit for public comment, and finalize its own TMDL within thirty days." *Id.* (citation omitted).

How do I know the U.S. EPA's May 10, 2018 letter approves only Ohio's amended 2016 § 303(d) list, and not the TMDL-related remarks the Ohio EPA made in the Amended Submission?

The documents themselves provide the answer.

First, the letter the Ohio EPA included with the Amended Submission identifies the submission as "an amendment to the final Ohio 2016 Integrated Water Quality Monitoring and Assessment Report for U.S. EPA's review and approval under Section 303(d) of the Clean Water Act." (Doc. 30-1, ID 9026).

Second, the Amended Submission itself updates Ohio's 2016 impaired waters list to add a recreational use algal impairment for the open waters of Lake Erie's Western Basin, as well as a public drinking water use impairment for assessment units in the Western Basin, Central Basin, and the Sandusky Bay due to microcystin. These designations harmonize with the State's responsibilities in § 303(d) to "identify those waters within its boundaries for which [current] effluent limitations . . . are not stringent enough to implement . . . water quality standards applicable to such waters," 33 U.S.C. § 1313(d)(1)(A), including Ohio's narrative water quality criteria for "nuisance growth of aquatic weeds and algae." Ohio Admin. Code § 3745-1-04(E).

Third, the U.S. EPA's May 10, 2018 response letter confirms that its approval relates exclusively to Ohio's § 303(d) amendment:

> Based on Ohio EPA's May 4, 2018 letter and its revised 2016 [Integrated Report], EPA finds that Ohio has met the requirements of Section 303(d) of the CWA. . . . This supplemental decision constitutes EPA's rationale for approving the remainder of Ohio EPA's 2016 Section 303(d) list, which was the subject of EPA's January 2018 withdrawal letter. Specifically, EPA is approving the list of the open water assessment units of Lake Erie as impaired for the recreational use due to the presence of algae and/or the public drinking water supply use due to microcystin. Consequently, EPA has now approved Ohio's 2016 Section 303(d) list in its entirety.

(Doc. 30-3, ID 9092).

An agency action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process" and if it is "one by which 'rights or obligations have been determined,' or from which

'legal consequences will follow.'" *Jama v. Dep't of Homeland Security*, 760 F.3d 490, 495–96 (6th Cir. 2014).

Plainly, the above language "consummat[es]" the U.S. EPA's decisionmaking process regarding Ohio's 2016 § 303(d) list. Earlier in the letter, the U.S. EPA says just that: "This supplemental decision and the May 2017 decision together complete the EPA's review and approval of Ohio EPA's 2016 CWA Section 303(d) list." (*Id.* at 9091). The letter also determines Ohio's rights and obligations with respect to that list, with the federal Agency "now approv[ing] Ohio's 2016 Section 303(d) list in its entirety." (*Id.* at 9092).

Regarding Ohio's intent to develop (or not develop) a TMDL, on the other hand, the U.S. EPA's May 10, 2018 response says nothing.

If the Agency signals its final approval of a § 303(d) list by specifying that "[t]his decision . . . complete[s] the EPA's review and approval of Ohio EPA's . . . Section 303(d) list," one might assume it would use equivalent language to communicate an equally final approval of a state's TMDL plans. Yet the U.S. EPA used no such language relative to Ohio's discussion of its plan to substitute the GLWQA process as an alternative to the TMDL process.

Nevertheless, plaintiffs maintain the Agency approved that variant approach.

In support of their contention, plaintiffs point to the U.S. EPA's statement "[f]ind[ing] that Ohio EPA's discussion of its prioritization of Lake Erie satisfies the requirement to submit a priority ranking" under 40 C.F.R. § 130.7(b)(4). (Doc. 30-3, ID 9092). According to plaintiffs, the "Ohio EPA's discussion of its prioritization" necessarily includes its statements characterizing the GLWQA as "the best approach for solving the issues in western Lake Erie," and indicating that it will develop a TMDL only after this "collaborative process fail[s] to restore" the Lake to its "designated use attainment." (Doc. 30-2 ID 9035).

Since the U.S. EPA found that the "Ohio EPA's discussion of its prioritization . . . satisfies the requirement to submit a priority ranking," plaintiffs argue it must have also found that the Ohio EPA's TMDL-related statements "satisfie[d]" the CWA's requirements.

Their interpretation does not persuade me.

The regulation the U.S. EPA cited, 40 C.F.R. § 130.7(b)(4), merely requires states to "include a priority ranking for all water quality-limited segments still requiring TMDLs" in their impaired water lists. It does not authorize the U.S. EPA to review or pass judgment on a state's priority ranking.

More to the point, the U.S. EPA did not cite the statutory provision that directs the EPA Administrator to approve or disapprove a state's proposed TMDLs "not later than thirty days after the date of submission." 33 U.S.C. § 1313(d)(2). Such an omission is unlikely if that is what the U.S. EPA meant to do.

Where the U.S. EPA has issued letters approving or disapproving a state's TMDL plans, the Agency makes that point plain. The case on which plaintiffs rely, *Sierra Club v. McLerran*, 2015 WL 1188522 (W.D. Wash. 2015), proves as much.

*McLerran* involved a specific request from an environmental advocacy group asking the U.S. EPA to determine whether the Washington State Department of Ecology had "abandoned" the TMDL process for a specific chemical in the Spokane River, "thereby triggering the EPA's duty to prepare a TMDL" on the state's behalf. *Id.* at *4. In response, the U.S. EPA issued a specific decision concluding the state "had not renounced the completion of a . . . TMDL," and affirming Washington's discretion to delay the TMDL process. *Id.*

Because the U.S. EPA issued a final agency decision explicitly approving Washington's delayed TMDL implementation, the court could conduct APA review to determine whether that

decision was "arbitrary, capricious," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Here, by contrast, the U.S. EPA did not issue its May 18, 2018 letter in response to plaintiffs' request for a specific finding approving or disapproving Ohio's TMDL statements. It issued the letter in response to Ohio's 2016 Amended Submission, for the express purpose of "approving the remainder of Ohio EPA's 2016 Section 303(d) list," thereby "approv[ing] Ohio's 2016 Section 303(d) list in its entirety." (Doc. 30-3, ID 9092). To conclude otherwise ignores both the language of the letter and the context of this case.

I will not infer that the U.S. EPA completed a review and approval Ohio's TMDL plans when all it claimed to do was "complete . . . review and approval of Ohio EPA's 2016 CWA Section 303(d) list." (*Id.* at 9091).

Because plaintiffs have not shown that the U.S. EPA's May 10, 2018 letter is a decision approving Ohio's TMDL remarks, they have failed to identify the "final agency action" predicate to an APA claim. 5 U.S.C. § 704. Count I of the proposed supplemental complaint therefore fails to state a claim on which relief can be granted.[5]

---

[5] Defendants also argue that a proposed APA claim premised on the U.S. EPA's approval of Ohio's Amended 2016 § 303(d) list is moot in view of the U.S. EPA's later approval of Ohio's 2018 § 303(d) list, which the Agency issued only two months after approving the Amended 2016 submission. *See* n.4, *supra*. If plaintiffs were still pursuing a claim based on the substantive decision to approve, or disapprove the 2016 impaired waters list, I might agree with them. *See Blue Water Baltimore v. Pruitt*, 266 F. Supp.3d 174, 180–81 (D. D.C. 2017) ("In the EPA's own guidance regarding the submission of Integrated Reports, it makes clear that an Integrated Report's list of impaired waters, 'once approved, . . . is a new list that replaces the previous list.'" (citation and brackets omitted, emphasis in original)). But they are not. Rather, plaintiffs allege the May 10, 2018 letter approves Ohio's TMDL statements, when in fact it doesn't. I accept defendants' argument that there is no "requirement for states to submit TMDLs with their Section 303(d) lists or as part of an integrated report," (Doc. 43, ID 9428) and that "the TMDLs themselves are not part of the integrated report" or the § 303(d) list. (Doc. 39, ID 9275). Having accepted those claims, I do not see how one letter, which does not approve the TMDL statements in Ohio's Amended 2016 submission, is superseded and mooted by another letter that, as best I can tell, also does not

## B. Ohio's TMDL Statements Do Not
## Prove Constructive Submission

Plaintiffs' proposed Count II also relies on *McLerran*, but for a different proposition. It asserts a CWA citizen suit for "an alleged failure of the [EPA] Administrator to perform" a nondiscretionary "act or duty," 33 U.S.C. § 1365(a)(2). The required act, plaintiffs contend, is disapproval of the Ohio EPA's stated intent to follow the GLWQA, instead of developing a TMDL for phosphorus runoff.[6]

This alternative cause of action relies on the "constructive submission" doctrine, which the Seventh Circuit first enunciated in *Scott v. Hammond*, *supra*, 741 F.2d at 996.

The constructive submission doctrine is premised on the U.S. EPA's statutory duty to act on a state's TMDL submission within thirty days. 33 U.S.C. § 1313(d)(2). *Scott* posits that where "a state fails over a long period to time to submit proposed TMDL's, this prolonged failure may amount to the 'constructive submission' by that state of no TMDL's." *Id.*

_____

approve the TMDL statements in Ohio's 2018 impaired waters list. I instead conclude Count I of the proposed supplemental complaint fails to state a claim because plaintiffs have not identified the final agency action necessary to pursue an APA claim.

[6] Strict "compliance with the notice and delay provisions of § 1365(b)(1)(A)" and 40 C.F.R. § 135.3(a) is "a mandatory condition precedent to the commencement" of a CWA citizen suit. *Historic Green Springs, Inc. v. Louisa Cty. Water Auth.*, 833 F. Supp. 2d 562, 565 (W.D. Va. 2011) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 399 (4th Cir. 2011)). Whether plaintiffs have satisfied these requirements is unclear. Plaintiffs acknowledge they initially sent defendants notice via priority, rather than certified mail, and then sent the correct notice less than sixty days prior to seeking leave to supplement. (Doc. 40, ID 9309 n.3). Defendants asserted the lack of notice as a defense in their opposition to plaintiffs' motion to supplement (Doc. 39, ID 9286-87), but dropped that argument during a subsequent status teleconference discussion (*see* Doc. 58, ID 9713-14). Ultimately, however, I need not address the notice-and-delay issue to rule on plaintiffs' motion to supplement. That plaintiffs' proposed citizen suit in Count II fails to state a claim is reason enough to deny the motion.

"As a 'submission,'" a state's prolonged failure to submit TMDLs "would then trigger the EPA's nondiscretionary duty under § 1313(d)(2) to approve or disapprove the submission of 'no TMDLs' within thirty days." *Hayes*, *supra*, 264 F.3d at 1023 (citing 33 U.S.C. § 1313(d)(2)). "If the EPA fails to respond within this period, it is subject to suit under the citizen-suit provision of the Clean Water Act to compel it to perform this nondiscretionary duty." *Id.* [7]

"Courts that have endorsed this doctrine note that without it, states could refuse to promulgate their own TMDLs and therefore easily frustrate 'an important aspect of the federal scheme of water pollution control.'" *Ohio Valley Envtl. Coal.*, *supra*, 893 F.3d at 229–30 (quoting *Scott*, *supra*, 741 F.2d at 997, and collecting cases).

However, these same authorities also caution against applying the doctrine too broadly.

In *Hayes,* for instance, the Tenth Circuit held that constructive submission occurs "only when the state's actions clearly and unambiguously" demonstrate an intent not to submit any TMDLs. 264 F.3d at 1024. There, Oklahoma submitted between three and twenty-nine TMDLs to the U.S. EPA (though the plaintiffs argued many were insufficient) and was "making progress toward completing about 1500 TMDLs over a twelve-year period." *Id.* Under those circumstances, "a constructive-submission claim is not viable." *Id.*; *see also, e.g.*, *San Francisco BayKeeper*, *supra*, 297 F.3d at 883 (declining to find constructive submission where California "submitted at least eighteen TMDLs and has established a schedule for completing its remaining TMDLs").

---

[7] Alternatively, "[i]f the EPA approves the constructive submission of no TMDLs, the next step for a dissatisfied party would be to seek judicial review of the EPA's action. If the EPA disapproves then it presumably would be under a mandatory duty to issue its own TMDLs." *Ohio Envtl. Coal.*, *supra*, 893 F.3d at 229 (citations, ellipsis, and brackets omitted).

*Hayes* is also indicative of the tendency to evaluate TMDL programs on a state-wide basis – a useful approach in terms of discerning whether a state actually intends to abandon wholly the TMDL process.

For example, courts will not infer constructive submission where a state "has produced at least some TMDLs" in the past and "has a plan in place to produce others" in the future. *Ohio Valley Envtl. Coal.*, *supra*, 893 F.3d at 230; *see also Sierra Club v. Hankinson*, 939 F. Supp. 865, 872 n.6 (N.D. Ga. 1996) (no constructive submission where Georgia has "made *some* . . . albeit totally inadequate" TMDL submissions). On the other hand, a state that has "not submitted a single TMDL to the EPA" over a number of years, *Alaska Ctr. for the Env't*, *supra*, 762 F. Supp. at 1425, 1429, and has "no plans to remedy this situation," *San Francisco BayKeeper*, *supra*, 297 F.3d at 882–83, may well have "clearly and unambiguously" forgone its TMDL obligations.

According to the parties' research, *McLerran* may be the only exception to this general rule.

*McLerran* opined that constructive submission can also occur in the case of a state's refusal to develop a single, specific TMDL, even where that state might have an adequate TMDL program on the whole:

> [T]he Court finds nothing in the text of the CWA or its purpose to support Defendants' contention that a state's abandonment of a specific statutory obligation should be treated differently from a state's wholesale failure. To the contrary, a state's discretion to prioritize TMDLs over other TMDLs does not remove its ultimate obligation to produce a TMDL for each water pollutant of concern in every 303(d) water segment. In light of this statutory obligation, it would be absurd for the Court to hold that a state could perpetually avoid this requirement under the guise of prioritization; such an administrative purgatory clearly contravenes the goal and purpose of the CWA. Accordingly, the Court rejects Defendants [*sic*] contention that the constructive submission doctrine cannot apply when a state abandons its obligations under the CWA by clearly and unambiguously indicating that it will not produce a particular TMDL.

2015 WL 1188522 at * 7 (citations omitted).

*McLerran*'s reasoning is consistent with the statute's demand that each state "shall" establish TMDLs for its impaired waters. 33 U.S.C. § 1313(d)(1)(C). After all, "a state that has publicly indicated . . . that it will not produce a TMDL has violated its statutory obligations with respect to that TMDL, no matter how robust its [state-wide TMDL] program otherwise is." *Id.* (citing 40 C.F.R. § 130.2(f)).

But even the *McLerran* court did not find that Washington had "constructively submitted" no TMDL for the Spokane River. Washington first listed the River as impaired "nearly 20 years" earlier, and it "still contain[ed] the worst [polychlorinated biphenyl] pollution in the state." *Id.* at *10. Still, the *McLerran* court concluded that "information gaps persisted such that [the state] determined that it could not confidently issue a TMDL at any point in the near future." *Id.* at *8. The state "lacked sufficient scientific data and had not satisfied certain pre-submission requirements, *i.e.*, public notice and consultation." *Id.*

Plaintiffs here have even less to go on than the court in *McLerran* did.

To begin with, despite all that Ohio has done, especially recently, to ignore the problem of farmland phosphorous runoff and to evade its obligations to the citizens of Northwest Ohio, its inattention and indifference have not been with regard to the duty to develop TDMLs.

The fact remains that it has been but a few months since Ohio first declared Lake Erie's open waters impaired on May 4, 2018. Years of inaction following an impaired listing may reasonably prompt a court to consider whether a state has "clearly and unambiguously" abandoned its TMDL obligations. *See Ohio Valley Envtl. Coal.*, *supra*, 893 F.3d at 231(addressing West Virginia's plan to complete TMDLs within eight years); *Scott*, *supra*, 741 F.2d at 996 n.10 (remand to determine constructive submission where neither Illinois nor Indiana had submitted any TMDLs in roughly five years). Months of inaction will not.

Nor can plaintiffs transform months into years by casting Ohio's no-TMDL statements as part of the State's broader "history" of lax environmental action. (Doc. 36-1, ¶ 7).

As I trust my April 11, 2018 order amply demonstrates, I am familiar with Ohio's feeble CWA compliance *vis-à-vis* Lake Erie's imperiled Western Basin. But recitation in the proposed supplemental complaint of those disheartening historical facts (*see* Doc. 36-1, ¶¶ 4-5, 7, 9-15, 69-73) does not reach the demanding threshold for stating a cognizable claim for constructive submission.

Again, "[t]he constructive submission doctrine rests" on the U.S. EPA's statutory duty to approve or disapprove a TMDL submission. *Ohio Valley Envtl. Coal.*, *supra*, 893 F.3d at 229 (citing 33 U.S.C. § 1313(d)(2)). A state need not submit TMDLs until and unless it declares a certain water quality segment impaired. Only thereafter may a state's subsequent and prolonged failure to submit TMDLs ripen into "a constructive submission" of no TMDLs. *Scott*, *supra*, 741 F.2d at 996.

Having designated Lake Erie's open waters as impaired for the first time, as tardy as that may be, on May 4, 2018, Ohio still has "a long period of time" to sit on its hands before plaintiffs can plausibly allege that it has constructively submitted no TMDLs. *Id.* This is so, despite Ohio's dilatory approach and resulting delay in even acknowledging the impaired condition of the Western Basin. As unfortunate as that approach and delay have been, under the law as is, the hands on the TDML clock have just begun to turn. Given the current state of the law of constructive submission, I cannot conclude that Ohio has "'clearly and unambiguously' *refused to submit TMDLs* in violation of the Clean Water Act" in perpetuity. *Ohio Valley Envtl. Coal.*, *supra*, 893 F.3d at 231 (quoting *Hayes*, *supra*, 264 F.3d at 1024) (emphasis supplied).

That Ohio intends to follow the GLWQA protocol, instead of turning forthwith to developing a TMDL, does not alter my conclusion.

Plaintiffs base their constructive submission claim on the Ohio EPA's TMDL statements in the Amended Submission. They characterize those statements as a "definitive[]," "explicit refusal" to develop a TMDL addressing HABs in Lake Erie. (Doc. 36-1, ¶¶ 92, 5, 59).

But what the Ohio EPA actually said is not as "definitive" as plaintiffs contend:

> Given the complexity of the algae bloom problem, Ohio believes the best approach for solving the issues in western Lake Erie is through the collaborative process established under Annex 4 of the [GLWQA] and the Domestic Action Plans as they afford a holistic, multi-jurisdictional perspective that does not exist in a traditional TMDL process. If the current collaborative processes fail to restore the designated use attainment, we recognize that a TMDL or other approach allowed by the U.S. EPA to addressed impaired waters under the CWA will ultimately be required.

(Doc. 30-2, ID 9035).

This statement, even when read against the backdrop of years of inaction, does not rise to the level as needed to state a plausible claim of constructive submission – namely, of proof that a state has "'clearly and unambiguously' decided not to submit any TMDLs." *San Francisco BayKeeper*, *supra*, 297 F.3d at 883 (quoting *Hayes*, *supra*, 264 F.3d at 1024).

Ohio's preference for the GLWQA "collaborative process" for now simply is not the same as a clear and unambiguous statement of intent never to perform that duty. It has not yet renounced the TMDL process. To the contrary, the Ohio EPA "recognize[s] that a TMDL or other approach . . . will ultimately be required" if the GLWQA does not restore Lake Erie for its designated and essential uses.

Ohio's failure to explain when or how it will know if the "collaborative process" can restore or has restored the Lake is certainly troubling. But its Amended Submission notes that the GLWQA has two built-in benchmarks: "phosphorus reduction goals of 20 percent by 2020, and 40 percent

by 2025" – though these may be "revised" based on an "adaptive management philosophy." (Doc. 30-2, ID 9035). Presumably, if the State does meet these goals, it will begin TDML work in either 2020, or 2025. Even with that late start, Ohio could possibly complete the TMDL process within the U.S. EPA's envisioned eight- to thirteen-year timeline.

As already noted, developing a TMDL is not optional. "Each State *shall* establish" a TMDL for particular pollutants as required by the CWA. 33 U.S.C. § 1313(d)(1)(C) (emphasis added). Ohio is not free to walk forever away from that process, or to follow for as long as it wants some ultimately unproductive alternative. *See McLerran*, *supra*, 2015 WL 1188522 at * 10 ("[N]othing in the CWA provides that state may pursue [other] courses in place of, or as a means of indefinitely delaying a TMDL."). The hands on the TMDL clock will continue to turn while Ohio embarks on the course it has chosen for now.

Further, skepticism about the outcome of the GLWQA approach is not unwarranted. Ohio's description of what that has entailed and will entail is opaque. Success appears to depend, perhaps in no small part, on the commitment of the other jurisdictions that will be working with Ohio. The prospect that come 2025 Ohio will conclude that, if such proves to be so, the GLWQA has failed is, at best, worrisome. If that occurs, time that Ohio could spent, probably for profitably, on determining TDMLs will have been irredeemably lost.

This is even more so if Ohio continues to rely on its past, utterly failed, wastefully costly efforts to secure voluntary compliance from those who want to remain free from statutory or regulatory restraint. There is, quite simply, no reason whatsoever to believe that continued exhortation, without more, will work – or have any useful effect. Indeed, it's a placebo that increases the risk of region-wide harm without the placebo's comforting effect that maybe something curative may be happening.

However, with all that said, plaintiffs have not cited and I have not found any case law basis for finding constructive submission in this case and these circumstances. *C.f.*, *San Francisco BayKeeper*, *supra*, 297 F.3d at 883 (holding that states need not submit TMDLs "simultaneously" with their biennial impaired waters lists). The lack of precedent for finding constructive submission in a case like this is telling.

The unambiguous intent of Congress when it drafted the CWA is "that States remain at the front line in combating pollution." *City of Arcadia v. EPA*, 411 F.3d 1103, 1106 (9th Cir. 2005). In the draftsmen's view, localized state agencies are best positioned to assess waters within their boundaries, and to determine, in light of their limited resources and the degree of impairment, which TMDLs to prioritize. Even the *McLerran* court recognized "state discretion" as an "[u]nquestionably . . . important component" of the CWA. 2015 WL 1188522 at *6.

These statutory principles, and the constitutional doctrine of federalism they express, trump the constructive submission allegations in this case. To find otherwise would extend that judge-made doctrine beyond its rigorously demanding prerequisites.

The allegations in the proposed supplemental complaint do not satisfy those demands.

One can, and many undoubtedly do, lament the time already lost as the General Assembly and Executive branch turned their backs on a long-standing, persistent, and possibly worsening problem. But that lost time, regardless of its length, does not count in the constructive submission calculation. That is the law, and no court can go beyond what the law allows.

Congress gave the states the responsibility, the obligation, and the duty to protect the wellbeing of their residents. Where the state fails to do so, it is for its citizens whose welfare is at risk – and not the courts, and certainly not the *federal* courts – to hold the state's officials to account.

That is the way our federal system of government is meant to work. If it does not work, the citizens who want it to do so must, under our Constitution and laws, look elsewhere other than the courts to make it work.

Accordingly, like Count I, Count II of the proposed supplemental complaint fails to state a claim on which relief can be granted. Granting leave to supplement under these circumstances would be futile. I will therefore deny plaintiffs' Rule 15(d) motion to supplement the complaint.

I will also deny as moot the Lucas County Board of Commissioners' motion to intervene as a party plaintiff. (Doc. 56).[8]

## 2. Defendants' Counter-Motion for Summary Judgement

That leaves only defendants' counter-motion for summary judgment (Doc. 38), which relates to plaintiffs' original APA claim – that the U.S. EPA's approval of Ohio's first 2016 § 303(d) list was "arbitrary, capricious," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

For the reasons stated in my April 11, 2018 order, I grant the motion.

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To succeed on an APA claim, an essential element plaintiffs must prove is that the decision they challenge is a "final agency action." 5 U.S.C. § 704. (*See* Doc. 29, ID 9015-17). When the U.S. EPA withdrew its former approval of Ohio's original 2016 § 303(d) list, there no longer was

---

[8] The Lucas County Board of Commissioners' intervenor complaint largely mirrors plaintiffs' proposed supplemental complaint and offers no additional facts that may assist either party in stating viable claims. (Doc. 56-1).

a final agency action for the plaintiffs to assail. *See Marquette Cty. Rd. Comm'n, supra*, 188 F. Supp.3d at 646–47.

The reasons I gave for denying plaintiffs' summary judgment motion in my April 11, 2018 order require me likewise to grant summary judgment in favor of defendants: plaintiffs cannot challenge an agency decision that no longer is in effect, nor can they reframe their original claim as a CWA citizen suit as to which they did not provide the requisite pre-suit notice under 33 U.S.C. § 1365(a)(2). (Doc. 29, ID 9013-19).

Defendants are therefore entitled to summary judgment on plaintiffs' initial APA claim.

## Conclusion

It is, therefore,

ORDERED THAT:

1.  Defendants' counter-motion for summary judgment (Doc. 38) be, and the same hereby is, granted;

2.  Plaintiffs' motion for leave to supplement the complaint (Doc. 36) be, and the same hereby is, denied;

3.  The Lucas County Board of Commissioners' motion to intervene (Doc. 56) be, and the same hereby is, denied as moot; and

4.  Defendants' brief in response to plaintiffs' motion for attorneys' fees (Doc. 57), is due October 20, 2018; plaintiffs' reply in support of their motion is due November 1, 2018.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge